FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2010 MAY 20  P 2: 24

CLERK'S OFFICE
AT GREENBELT

BY ___ DEPUTY

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

LINDA E. FARWELL,　　　　　　　*
15712 Jones Lane
Darnestown, MD  20878　　　　　*

　　　　Plaintiff　　　　　　　　*

　　　　v.　　　　　　　　　　　*

CHALLENGE FINANCIAL　　　　　*
INVESTORS CORPORATION,　　　*
360 Central Avenue
Suite 600　　　　　　　　　　　*
St. Petersburg, Florida 33701　　*

　　　　SERVE: National Registered *
　　　　Agents, Inc. of Md., Second  *
　　　　Floor, 836 Park Avenue,　　*
　　　　Baltimore, MD 21201　　　*

　　　　And　　　　　　　　　　*

LEON STORY　　　　　　　　　*
433 Clayton Lane　　　　　　　*
Alexandria, VA  22304　　　　　*

　　　　And　　　　　　　　　　*

BRIDGE STREET APPRAISALS　*
501 Fairfax Lane　　　　　　　　*
Herndon, VA  20171　　　　　　*

　　　　And　　　　　　　　　　*

PNC MORTGAGE　　　　　　　*
George P. Long, III, Secretary　　*
249 Fifth Avenue　　　　　　　*
Pittsburgh, PA  15222-2707　　　*

　　　　SERVE:  CSC-Lawyers　　*
　　　　Incorporating Service　　　*
　　　　Company, 7 St. Paul Street, *
　　　　Suite 1660, Baltimore, MD  *
　　　　21202　　　　　　　　　*
　　　　　　　　　　　　　　　*

Civil Case _____

**DKC 10 CV 1274**

Defendants                    *

*     *     *     *     *     *     *     *     *     *     *

## COMPLAINT AND JURY DEMAND

Comes now, Plaintiff, Linda E. Farwell, by and through undersigned counsel, and hereby sues Defendants, Challenge Financial Investors Corporation, Leon Story, Bridge Street Appraisals, and PNC Mortgage, and avers the following:

### Claim Summary

Leon Story, Challenge Financial Investors Corporation and Bridge Street Appraisals (each a Defendant) conspired to defraud Linda E. Farwell (Plaintiff) into a mortgage loan, by which Defendants would receive fees. Defendants Story and Bridge falsely inflated the value of Plaintiff's house to increase the size of the loan, and thus, their fees. Defendants Story and Challenge further defrauded Plaintiff into believing that she could repay the loan by virtue of an incredible rise in her home's value, even though Story and Challenge knew that she could not realistically repay the loan. Plaintiff has suffered a loss of equity in her home, destruction of her creditworthiness and increased medical costs related to the stress of her financial situation.

Defendant PNC Mortgage (successor-in-interest to National City Mortgage) violated the Truth-in-Lending Act, and its implementing regulation, Regulation Z, by issuing closing documents that listed two different loan amounts and several different monthly payment amounts. PNC violated the Maryland Consumer Protection Act by unfairly giving a $641,750.00 mortgage loan to Plaintiff, even though Plaintiff had no income, thereby setting up Plaintiff for default. PNC violated the Fair Debt Collection Practices Act by directly contacting Plaintiff for collection of Plaintiff's debt, even though

PNC should have known Plaintiff was represented by an attorney.  Finally, PNC breached its mortgage contract with Plaintiff by not dealing with her in good faith, and attempting to forestall her efforts to use various programs to pay her mortgage; such stalling action by PNC buys time for the bank to foreclose on Plaintiff's house.

### Parties and Jurisdiction

1.      Linda E. Farwell, Plaintiff, is a resident of Montgomery County, Maryland and suffers from multiple sclerosis ("MS"), a disease that affects her judgment and comprehension of financial matters.

2.      At all times relevant hereto, Challenge Financial Investment Corporation ("Challenge"), Defendant, which had its status in Maryland forfeited and is not in good standing in Maryland, was a mortgage broker having its principal place of business in the State of Florida, that regularly does or solicits business and engages in a persistent course of conduct in Montgomery County, Maryland, and/or that derives substantial revenue from services used in Montgomery County, Maryland.

3.      At all times relevant hereto, Leon Story ("Story"), Defendant, was a mortgage broker who was licensed in, and has a principal place of business in, the Commonwealth of Virginia, who regularly does or solicits business and engages in a persistent course of conduct in Montgomery County, Maryland, and/or who derives substantial revenue from services used in Montgomery County, Maryland.

4.      Bridge Street Appraisals ("Bridge"), Defendant, is a real estate appraisal company having its principal place of business in the Commonwealth of Virginia that regularly does or solicits business and engages in a persistent course of conduct in

Montgomery County, Maryland, and/or that derives substantial revenue from services used in Montgomery County, Maryland.

5.      Upon information and belief, PNC Mortgage ("PNC"), Defendant, is a mortgage company having its principal place of business in the State of Ohio that is the successor-in-interest with National City Mortgage, and regularly does or solicits business and engages in a persistent course of conduct in Montgomery County, Maryland, and/or that derives substantial revenue from services used in Montgomery County, Maryland.

6.      The occurrence out of which this case arises took place in Montgomery County, Maryland.

### Facts Common to All Counts

7.      Prior to her refinancing contract through Story with Challenge, Plaintiff resided at 15712 Jones Lane, Darnestown, Maryland 20878 pursuant to a mortgage with GMAC Mortgage (entered into on January 10, 2007) that had an adjustable interest rate of 6.875 percent, a principal amount of $566,250.00, and a monthly payment of $3,244.14 - this loan with GMAC was also brokered by Story within three months of Plaintiff's mortgage with National, illustrating Story's predatory loan practices.. (Complaint Exhibit Two).

8.      Responding to an advertisement of Story's, unemployed Plaintiff and Story commenced negotiating for a refinancing of Plaintiff's mortgage in 2004 (while Plaintiff was suffering from optic neuritis, severe headaches, vertigo and blindness in one eye), and Story acted as the broker for Plaintiff's mortgage refinancings in 2005 and January 2007; Story discussed business investments that he would make with Plaintiff and claimed that Story had profited from said investments, and could show Plaintiff how

to profit and join her in an investment; with the promise that Plaintiff's house would soon have a market value of over $1,000,000.00.

9.    During the time that Story was working on the subject mortgage with National, Plaintiff was suffering acutely from MS, which caused her to be bedridden.

10.    Story preyed on Plaintiff's vulnerable status as an older person who lived alone, and was very ill.

11.    Story convinced Plaintiff that refinancing, rather than selling, her home was in Plaintiff's best interests, and Story called Plaintiff frequently to make Plaintiff believe that Story was her friend.

12.    In some conversations between Story and Plaintiff, Story promised Plaintiff that he would be able to lower her monthly mortgage payments in the immediate future after Plaintiff refinanced her GMAC mortgage loan through National, which Story promised Plaintiff would be an interest-only loan for the life of the loan.

13.    Story told Plaintiff (who had perfect credit at the time) that her Private Mortgage Insurance would be cancelled when he refinanced her house through National.

14.    Story assured Plaintiff that the value of her house would soon increase to over $1,000,000.00.

15.    Story's handwritten notes (discovered by Plaintiff in March 2010) noted the following: "Duty of care - ability to repay - no income  bedridden - MS" and "Appraiser did what told to do.  $750K"; Story knew that Plaintiff had no income, and was very ill with multiple sclerosis.  (Complaint Exhibit Three).

16.    Pursuant to Story's instructions, Bridge on December 11, 2006 appraised the value of Plaintiff's house at $755,000.00, fully $188,750.00 more than the settled

principal of the mortgage on the house 30 days later (the GMAC mortgage) and higher than the predominant value range for Plaintiff's neighborhood.  (Complaint Exhibit Four).

17.     Bridge did not view the interior of Plaintiff's house when making its appraisal, thus missing non-functioning garage doors, plumbing problems, a failing boiler and neutralizing tank, ceiling leaks, outdated appliances and damaged floors.

18.     Even with his exterior-only "inspection", Bridge still did not note that the roof of Plaintiff's house was approximately 30 years old and needed replacing.

19.     Bridge also falsely noted that the property was "improved with new thermo pane windows," a screened back porch and ceiling fans, when, in fact, the windows are original to the house and in need of replacement, the porch is original to the house and no ceiling fans had been installed.

20.     The "comparable" houses that Bridge used in its appraisal of Plaintiff's house contain discrepancies with other housing records.

21.     Bridge's first "comparable" house has one more bathroom than shown on the appraisal.

22.     Bridge's second "comparable" house has an extra half-bathroom that was not listed on Bridge's appraisal, and contains 428 more square feet than listed on Bridge's appraisal.

23.     Bridge's third "comparable" is located in a different town (North Potomac, Maryland) than Plaintiff's house, is approximately ten years newer than Plaintiff's house, and is used for a business (Royal Carpet).

24.     On March 2, 2007, the Georgia Department of Banking and Finance, inter alia, revoked Challenge's mortgage lender's license as part of a Consent Order to

resolve allegations of Challenge's violations of the Georgia Residential Mortgage Act and agency rules.

25.     On April 11, 2007, Plaintiff signed documents ("Closing Documents") for a closing of her refinancing with National City Mortgage ("National").

26.     The Closing Documents, which came from National, were contradictory and confusing to Plaintiff.

27.     As part of the Closing Documents, Plaintiff was given an Amortization Schedule that listed Plaintiff's initial monthly payments for the refinancing with National as $3,676.69.  (Complaint Exhibit Five).

28.     As part of the Closing Documents, the Borrower Personal Information did not list a work number for Plaintiff, as Plaintiff was unemployed and had no income. (Complaint Exhibit Six).

29.     As part of the Closing Documents, the Deed of Trust lists Plaintiff's debt to National as $641,750.00.  (Complaint Exhibit Seven).

30.     As part of the Closing Documents, Plaintiff signed an Interest Only Payment Period Note Addendum which stated that Plaintiff's monthly payments for the first 120 months of the refinanced mortgage would be $3,676.69, and thereafter would be $4,927.45.  (Complaint Exhibit Eight).

31.     As part of the Closing Documents, Plaintiff signed the Note, which listed the Principal of Plaintiff's refinanced mortgage as $641,750.00, and Plaintiff's monthly payment as $4,215.85, in direct contradiction to the documents described in the preceding paragraphs of this Complaint.  (Complaint Exhibit Nine).

32.     As part of the Closing Documents, Plaintiff signed a Payment Breakdown that lists Plaintiff's initial monthly payments as $4,453.86, in direct contradiction with the initial monthly payment amount in the Closing Documents described in the preceding paragraphs of this Complaint. (Complaint Exhibit Ten).

33.     As part of the Closing Documents, a Request for Title Commitment lists the loan amount for Plaintiff's refinancing as $641,750.00. (Complaint Exhibit Eleven).

34.     As part of the Closing Documents, a Settlement Statement listed the loan amount as $641,750.00. (Complaint Exhibit Twelve).

35.     As part of the Closing Documents, a document entitled Special Loan Instructions listed the loan amount as $641,750.00; and the mortgage amount as $641,750.00, and after deduction of fees, a loan draft amount of $637,874.88. (Complaint Exhibit Thirteen).

36.     As part of the Closing Documents, the Truth-in-Lending Disclosure Statement listed the amount financed (the loan amount) as $631,922.30, in direct contradiction with the Closing Documents described in the preceding paragraphs of this Complaint. (Complaint Exhibit Fourteen).

37.     The Truth-in-Lending Disclosure Statement also listed Plaintiff's initial monthly payment as $4,018.96 for the first 120 months; $5,034.41 for the next 38 months thereafter; $4,927.45 for the next 201 months thereafter; and $4,924.07 for the final month of the loan term.

38.     The monthly payment schedule listed in the Truth-in-Lending Disclosure Statement directly contradicts the monthly payment schedules listed in the Closing Documents described in Paragraphs 20, 24, 25 and 28 of this Complaint.

39.     As part of the Closing Documents, the Uniform Residential Loan Application listed the loan amount as $641,750.00 with a monthly payment of $4,100.01. (Complaint Exhibit Fifteen).

40.     The Uniform Residential Loan Application's stated loan amount directly contradicts the loan amount listed in the Closing Document described in Paragraph 34 of this Complaint.

41.     The Uniform Residential Loan Application's stated monthly payment directly contradicts the monthly payments listed in the Closing Documents described in Paragraphs 20, 24, 25, 28 and 36 of this Complaint.

42.     The Uniform Residential Loan Application did not list any employment for Plaintiff.

43.     PNC Financial Services (which includes PNC Mortgage) acquired National City Corporation on December 31, 2008.

44.     Plaintiff received a letter from National dated February 24, 2009 that referenced a conversation had with a National Loan Counselor regarding mortgage relief options.  (Complaint Exhibit Sixteen).

45.     Plaintiff received a separate letter from National dated February 24, 2009 that requested Plaintiff's income and expense information to determine Plaintiff's eligibility for one of National's mortgage relief programs.  (Complaint Exhibit Seventeen).

46.     National sent a letter to Plaintiff dated March 21, 2009 which stated that National was considering Plaintiff for a loan modification, and that requested more financial information from Plaintiff. (Complaint Exhibit Eighteen).

47.    On May 1, 2009, Plaintiff signed a Borrowers' Certification and Authorization to permit Story, now with MidAtlantic Financial Group, Inc. ("MidAtlantic") to check the status of Plaintiff's loan modification request. (Complaint Exhibit Nineteen).

48.    National sent a letter to Plaintiff dated May 4, 2009 that requested Plaintiff's income and expense information. (Complaint Exhibit Twenty).

49.    National sent a letter to Plaintiff dated May 15, 2009 in which National declined Plaintiff's hardship assistance request because Plaintiff had "a deficit income." (Complaint Exhibit Twenty-One).

50.    National sent a letter to Plaintiff dated May 28, 2009 which stated that National had referred Plaintiff's loan to National's foreclosure department. (Complaint Exhibit Twenty-Two).

51.    National sent a letter to Plaintiff dated May 29, 2009 that stated that National had referred Plaintiff's loan to National's attorney "who has been instructed to proceed with foreclosure." (Complaint Exhibit Twenty-Three).

52.    On June 19, 2009, Plaintiff met with Paul Leibold ("Leibold") of National regarding the possibilities of a loan modification to allow Plaintiff to stay in her house. (Complaint Exhibit Twenty-Four).

53.    Leibold requested that a "hold" be placed on National's foreclosure efforts, and a hold was placed on such efforts on June 22, 2009.

54.    Leibold confirmed the hold to Plaintiff in an e-mail dated July 8, 2009.

55.    Plaintiff entered a Non-Curing Forbearance Agreement with National on August 21, 2009 under which National agreed to forbear its conduct of a foreclosure sale

until after November 30, 2009 in exchange for three monthly payments from Plaintiff of

$1,247.75.; National granted this forbearance because National was then considering

Plaintiff's HAMP application.  (Complaint Exhibit Twenty-Five).

     56.     PNC began rebranding National City Mortgage as "PNC Mortgage".

     57.     After the three months of the Agreement described in Paragraph 55 neared

expiration, National told Plaintiff that National's loan modification group had been too

busy to review Plaintiff's documentation, and thus National and Plaintiff entered another

Non-Curing Forbearance Agreement on November 24, 2009 under which National

agreed to forbear its conduct of a foreclosure sale until after February 28, 2010 in

exchange for three monthly payments of $1,247.75.  (Complaint Exhibit Twenty-Six).

     58.     When National / PNC made no action to offer Plaintiff a modification,

Plaintiff called PNC in mid-December 2009 and spoke with PNC's Michael Schick

("Schick"), who offered Plaintiff a trial modification under the federal Home Affordable

Modification Program ("HAMP").

     59.     When Plaintiff received the HAMP documents from PNC, it was clear to

Plaintiff that the payments were larger than the HAMP-mandated 31% of Plaintiff's

monthly income.

     60.     Plaintiff contacted PNC's HAMP advocacy line and inquired about the

income upon which the monthly payments were based.

     61.     PNC told Plaintiff that PNC based the payments on an income exceeding

$8,000.00 per month.

     62.     Realizing that either an electronic or clerical error had been made by

Schick (or perhaps another PNC employee), Plaintiff spoke to Jerry Solomon

("Solomon"), her attorney at the time, and Solomon contacted Schick and submitted documents to PNC that would confirm Plaintiff's income as well as the payment that would conform to HAMP's payment formula.

63.    By letter dated March 3, 2010 PNC Bank informed Plaintiff that it closed Plaintiff's Points VISA account due to "[s]erious delinquency and public record or collection filed at the bureau." (Complaint Exhibit Twenty-Seven).

64.    Plaintiff has heard from PNC employees, *inter alia,* that her loan was securitized, and that the owners of her securitized loan refused to participate in HAMP; that her loan was securitized, and the owners of her securitized loan are participating in HAMP; and that her loan is not securitized.

65.    On March 18, 2010, Cara McConnell ("McConnell") of PNC told Plaintiff that PNC did not know how to correct Schick's error, and that McConnell thought that the only way to proceed was to withdraw Plaintiff's HAMP application from the system in order to send a new HAMP application to Plaintiff, that would allow Plaintiff to re-apply for the HAMP program.

66.    Plaintiff (not Plaintiff's counsel) received a letter on March 22, 2010 from PNC Collections containing a box marked with an "X" indicating that Plaintiff had withdrawn from HAMP.

67.    Plaintiff spoke with Michelle Osborne ("Osborne") of PNC on March 22, 2010 who informed Plaintiff that Plaintiff's file had been sent to PNC Collections, and that Plaintiff could no longer speak to McConnell.

### COUNT I
(Violation of Truth in Lending Act, 15 U.S.C. Section 1601, et seq., and its implementing regulation, Regulation Z, 12 C.F.R. Section 226.17 et seq.)
PNC

68.     Plaintiff hereby incorporates by reference number Paragraphs 1-67 and further states:

69.     Plaintiff, as a borrower of consumer credit, has the right to bring an action under the Truth in Lending Act ("TILA"), as TILA confers a statutory right of action only on a borrower in a suit against a borrower's creditor, in this case, PNC (as successor-in-interest to National).  15 U.S.C. Section 1603(f).

70.     TILA is a consumer protection statute enacted by Congress "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. Section 1601(a).

71.     National violated Section 1601(a) of TILA by not providing a meaningful disclosure of credit terms so that Plaintiff would be able to compare more readily the various credit terms available to her and avoid the uninformed use of credit, as National supplied credit terms that showed two different loan amounts and five different monthly payment amounts.

72.     TILA is a remedial statute that is liberally construed in the favor of consumers, and that TILA's language of should be construed liberally in light of its broadly remedial purpose.

73.     In order to ensure that the consumer is protected as Congress envisioned, the provisions of TILA and its implementing regulations must be strictly enforced.

74.     A misleading disclosure is as much a violation of TILA as a failure to disclose at all.

13

75.     National's misleading disclosure of the loan amount and the monthly payment amounts violated TILA.

76.     TILA allows a borrower who uses her principal dwelling to secure her loan a right of rescission (15 U.S.C. § 1635(a)) and imposes a three-year statute of limitations on actions to rescind (15 U.S.C. Section 1635(f) states in pertinent part "An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first ...").

77.     Plaintiff used her principal dwelling to secure her loan with National, and thus has a right to rescind that loan; the loan was consummated on April 11, 2007, and Plaintiff is thus within her three-year time period to rescind.

78.     Regulation Z defines consummation as "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13).

79.     Moreover, Regulation Z provides that failure to provide a borrower with material loan disclosures extends the borrower's right to cancel the loan for up to three years. 12 C.F.R. § 226.23(a)(3).

80.     "In a credit transaction in which a security interest is or will be retained or acquired in a consumer's personal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction ...." 12 C.F.R. 226.23(a)(1).

81.     Thus, also under Regulation Z, Plaintiff has the right of rescission of the loan and is within the prescribed three-year time period for rescission.

82.     Under 15 U.S.C. Section 1638(a)-(b), creditors are required to disclose a list of specific loan terms to borrowers.

83.     Specifically, TILA requires a lender to disclose to a borrower, among other things, the amount financed, the finance charge, the annual percentage rate, and the total sale price. 15 U.S.C. § 1638; 12 C.F.R. § 226.18.

84.     National provided two different finance amounts to Plaintiff, and thus violated Section 1638 of TILA, and Section 226.18 of Regulation Z.

85.     The Federal Reserve Board's Staff Commentary ("Staff Commentary") in implementing TILA through Regulation Z provides that where any one of the three events does not occur (the three events including consummation of the transaction and delivery of all material disclosures), the consumer has three years from the consummation of the loan to rescind. 12 C.F.R. Pt. 226, Supp. I, cmt. 23(a)(3)-1.

86.     Section 226.23 of Regulation Z provides that the term "material disclosures" means the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in §§ 226.32(c) and (d) and 226.35(b)(2). 12 C.F.R. § 226.23 n. 48.

87.     National provided two different finance amounts and five different monthly payments on the payment schedules, and thus made material misleading disclosures to Plaintiff in violation of Section 226.23 of Regulation Z, allowing Plaintiff three years (until April 11, 2010) to rescind the loan.

88.     The TILA requires a creditor to disclose to a borrower certain material terms clearly and conspicuously in writing, in a form that the borrower may examine and retain for reference. 15 U.S.C. § 1638(b)(1); 12 C.F.R. § 226.17(a)(1).

89.     National provided contradictory material terms to Plaintiff, thus failing TILA's "clear and conspicuous requirement" in violation of Section 1638(b)(1) of TILA and Section 226.17(a)(1) of Regulation Z.

90.     The disclosures must reflect the actual terms of the legal obligation between the parties. 12 C.F.R. § 226.17(c)(1).

91.     Given the conflicting terms provided by National to Plaintiff, it is impossible to determine the actual terms of the legal obligations between the parties, meaning that National failed the requirement of Section 226.17(c)(1) of Regulation Z.

92.     In mortgage transactions the disclosures under 12 C.F.R. § 226.18 must "be delivered or mailed to the consumer no later than the third business day after the creditor receives the consumer's written application" and no "later than the seventh business day before consummation of the transaction." 12 C.F.R. § 226.19(a)(1)(i) & § 226.19(a)(2)(i).

93.     Plaintiff received the 12 C.F.R. § 226.18 disclosure by telefax on the day of the loan's consummation, April 11, 2007; thus, National violated Sections 226.19(a)(1)(i) and 226.19(a)(2)(i) of Regulation Z.

94.     Consumers that have refinanced their residential mortgage with a different creditor maintain the right to rescission of the mortgage pursuant to TILA and Regulation Z.

95.     Plaintiff refinanced her residential mortgage with a different creditor, National, than her previous mortgage lender, GMAC, and thus Plaintiff maintains the right of rescission.

96.     The equitable goal of rescission under the TILA is to restore the parties to the "status quo ante", i.e., placing the parties in their respective positions before the execution of the loans.

97.     The Court has the power of reformation of the mortgage agreement in instances of fraud or other inequitable conduct.

98.     WHEREFORE, Plaintiff demands judgment against Defendant PNC in the form of a rescission of the terms of Plaintiff's mortgage loan with PNC; reformation of a mortgage between Plaintiff and PNC with a loan amount for the fair market value of Plaintiff's house with monthly payments not to exceed 31% of Plaintiff's monthly income; termination of any claims for costs against Plaintiff made by PNC's attorneys; and restitution of all payments made by Plaintiff to National / PNC pursuant to that mortgage loan.  In addition, Plaintiff seeks costs and any other relief to which this Court finds Plaintiff is entitled.

## COUNT II
(Violation of the Maryland Consumer Protection Act, CL Section 13-101, et seq.)
PNC

99.     Plaintiff hereby incorporates by reference number Paragraphs 1-98 and further states:

100.    The Maryland Consumer Protection Act ("MCPA") prohibits "any unfair or deceptive trade practice ... in ... [t]he extension of consumer credit." Md.Code Ann., Com. Law § 13-303 (2009).

101.    TILA does not conflict with, or preempt, the MCPA.

102.    By enacting the MCPA, the General Assembly intended to "take strong protective and preventive steps to investigate unlawful consumer practices, to assist the

public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." *Id.* at § 13-102(b)(3).

103.     Md.Code Ann., Com. Law § 13-301 prohibits, among other things, misleading representations and deceptive omissions of material fact relating to covered transactions, including false or misleading statements or other factual representations which have the tendency to deceive the customer, Md.Code Ann., Commercial Law § 13-301 (the MCPA makes unlawful any "[u]nfair or deceptive trade practices includ[ing] any [d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with ... [t]he promotion or sale of any consumer goods, consumer realty, or consumer service...." Md. Code Ann. Comm. Law II § 13-301(9)(i)).

104.     Plaintiff has a contractual relationship with PNC, thus permitting Plaintiff to bring an action against PNC under the MCPA.

105.     National / PNC engaged in an unfair trade practice, thus violating Md. Code Ann. Comm. Law II § 13-301(9)(i)), because National / PNC knew, as evidenced by the Uniform Residential Loan Application, that Plaintiff had no job or income.

106.     When originating its loan with Plaintiff, National / PNC knew or should have known that Plaintiff could not reasonably repay the loan according to the loan's terms (which are conflicting) and that the loan would be subject to predictable delinquency and default.

107.    National / PNC issued the subject loan to Plaintiff without requiring the verification and/or consideration of traditional supporting documentation to demonstrate income, employment and assets.

108.    Although income is a crucial metric for purposes of assessing a borrower's ability to repay a loan, particularly for borrowers that have impaired credit or minimal assets, National / PNC failed to reasonably assess Plaintiff's income for this risky loan.

109.    It is uncertain whether National / PNC verified any of Plaintiff's employment, income or asset information.

110.    Had National / PNC taken steps to verify Plaintiff's income, it would have had a reasonable basis to assess whether Plaintiff could, in fact, afford to repay the loan.

111.    By issuing the subject loan without adequate borrower income verification and, without adequate asset or employer information, National / PNC could not reasonably analyze whether Plaintiff could afford to repay the loan and thus National / PNC subjected Plaintiff in this loan to a substantial risk of default.

112.    Not surprisingly, given National / PNC's failure to reasonably assess Plaintiff to repay the subject loan from the outset, the subject loan was delinquent almost from the beginning.

113.    Plaintiff has suffered tremendous physical (flare-ups of her MS with resulting worsening of her ability to walk and increased disabling MS fatigue), emotional (stress-related) and fiscal (increased doctors' costs, high monthly mortgage payments, equity-stripping) harm from National / PNC's unfair trade practice.

114.    To the extent National / PNC approved Plaintiff for the subject loan that she could never afford, should have never received, and was exceedingly risky, it is now Plaintiff herself who must struggle to address the reality created by National / PNC.

115.    WHEREFORE, Plaintiff demands judgment against Defendant PNC in the form of complete restitution for National / PNC's unfair trade practices.  In addition, Plaintiff seeks costs and any other relief to which this Court finds Plaintiff is entitled.

### COUNT III
(Violation of Fair Debt Collection Practices Act, 15 U.S.C. Section 1692 *et seq.*)
PNC

116.    Plaintiff hereby incorporates by reference number Paragraphs 1-115 and further states:

117.    To establish a *prima facie* case in an action for violation of the Fair Debt Collection Practices Act, the plaintiff must prove that (1) the defendant was a debt collector, (2) the defendant's conduct in attempting to collect a debt was prohibited by the Act and (3) the debt was a consumer debt.

118.    15 U.S.C. Section 1692c(a)(2) states that "Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer..."

119.   PNC knew that Plaintiff was represented by attorney Jerry Solomon by virtue of Solomon's contacts with PNC on behalf of Plaintiff with PNC.

120.   Yet, PNC, acting as a debt collector, thereafter contacted Plaintiff directly regarding the HAMP application and the collection of Plaintiff's consumer debt, constituting a violation of 15 U.S.C. Section 1692c(a)(2).

121.   WHEREFORE, Plaintiff demands judgment against Defendant PNC in the form of complete restitution of Plaintiff's stress-related medical fees for PNC's violation of the Fair Debt Collection Practices Act. In addition, Plaintiff seeks costs and any other relief to which this Court finds Plaintiff is entitled.

## COUNT IV
(Common Law Breach of Contract)
PNC

122.   Plaintiff hereby incorporates by reference number Paragraphs 1-121 and further states:

123.   Maryland recognizes an implied duty of good faith and fair dealing in contracts.

124.   The duty prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.

125.   PNC, by making conflicting statements to Plaintiff regarding the securitization of Plaintiff's loan and HAMP application, and denying the existence of conversations with Plaintiff, acted in bad faith in an attempt to forestall Plaintiff's ability to use a government or PNC-sponsored program to work out an affordable payment plan that would allow Plaintiff to perform her obligations under the mortgage contract.

126.   The Court has the power of reformation of the mortgage agreement in instances of fraud or other inequitable conduct.

127.   WHEREFORE, Plaintiff demands judgment against Defendant PNC in the form of a rescission of the terms of the mortgage contract due to PNC's material breach of that contract; reformation of a mortgage between Plaintiff and PNC with a loan amount for the fair market value of Plaintiff's house with monthly payments not to exceed 31% of Plaintiff's monthly income; and punitive damages in the amount of $250,000.00.  In addition, Plaintiff seeks costs and any other relief to which this Court finds Plaintiff is entitled.

### COUNT V
(Common Law Fraud and Unjust Enrichment)
Challenge and Story

128.   Plaintiff hereby incorporates by reference number Paragraphs 1-127 and further states:

129.   Under Maryland common law, fraud consists of the following elements: 1) that a representation made by a party was false; 2) that the defendant knew the representation was false or made the misrepresentation with such reckless indifference to truth as to impute knowledge and an intent to defraud; 3) that the misrepresentation was made for the purpose of deceiving the plaintiff; 4) that the plaintiff reasonably relied upon the misrepresentation; and 5) that the plaintiff suffered damage directly resulting from the misrepresentation.

130.   To establish a claim for unjust enrichment in Maryland, the Plaintiff must allege three elements: 1) a benefit conferred upon the defendant by the plaintiff; 2) an appreciation or knowledge by the defendant of the benefit; and 3) the acceptance or

retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

131.   Maryland courts generally do not recognize a cause of action for unjust enrichment where the relationship of the parties is set out in a valid contract, however, courts recognize certain exceptions to this rule, as in cases when there is evidence of fraud or bad faith, there has been breach of contract or a mutual rescission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter.

132.   Story, an agent of Challenge, committed fraud because he: 1) made representations to Plaintiff that Story knew were false, such as (a) Plaintiff's ability to repay a loan of $641,750.00 without any income and (b) Story's promise that Plaintiff's house would imminently be worth at least a million dollars; 2) Story knew his representations to Plaintiff were false and made these misrepresentations with such reckless indifference to truth (such as repaying a $641,750 loan without income) as to impute knowledge and an intent to defraud; 3) Story's misrepresentation was made with the intent to deceive Plaintiff, and allow Story to collect his fee for arranging a refinancing; 4) having dealt with Story before, Plaintiff reasonably relied upon Story's misrepresentations; and 5) Plaintiff suffered damage directly from Story's misrepresentations, including the loss of equity in her home, the destruction of her creditworthiness, threats of foreclosure and increased medical bills related to the stress related these harms.

133.   Story's handwritten notes show that he knew Plaintiff had no income, was bedridden with multiple sclerosis, and that Story arbitrarily arrived at an unrealistically

high price for a house appraisal ($750,000), ostensibly to increase the amount of his fee for brokering the refinanced mortgage.

134.    Story and Challenge were unjustly enriched by their fraud because:  1) Plaintiff conferred the benefit of origination fee payments to Challenge and Story; 2) Challenge and Story both had appreciation and knowledge of the benefit; and 3) the acceptance and retention of the benefit by Challenge and Story in this situation of fraud makes it inequitable for Challenge and Story to retain the benefit without payment of its value.

135.    The Court has the power of reformation of the mortgage agreement in instances of fraud or other inequitable conduct.

136.    WHEREFORE, Plaintiff demands judgment against Defendants Challenge and Story in the form of:  reformation of a mortgage between Plaintiff and PNC with a loan amount for the fair market value of Plaintiff's house with monthly payments not to exceed 31% of Plaintiff's monthly income; payment to Plaintiff of Challenge's and Story's fees from the subject mortgage transaction of April 11, 2007; payment of Plaintiff's medical costs related to stress suffered as a result of Defendants' fraud; and punitive damages in the amount of $250,000.00.  In addition, Plaintiff seeks costs and any other relief to which this Court finds Plaintiff is entitled.

## COUNT VI
(Common Law Fraud and Unjust Enrichment)
Bridge

137.    Plaintiff hereby incorporates by reference number Paragraphs 1-136 and further states:

138.    Under Maryland common law, fraud consists of the following elements: 1) that a representation made by a party was false; 2) that the defendant knew the representation was false or made the misrepresentation with such reckless indifference to truth as to impute knowledge and an intent to defraud; 3) that the misrepresentation was made for the purpose of deceiving the plaintiff; 4) that the plaintiff reasonably relied upon the misrepresentation; and 5) that the plaintiff suffered damage directly resulting from the misrepresentation.

139.    To establish a claim for unjust enrichment in Maryland, the Plaintiff must allege three elements: 1) a benefit conferred upon the defendant by the plaintiff; 2) an appreciation or knowledge by the defendant of the benefit; and 3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

140.    Maryland courts generally do not recognize a cause of action for unjust enrichment where the relationship of the parties is set out in a valid contract, however, courts recognize certain exceptions to this rule, as in cases when there is evidence of fraud or bad faith, there has breach of contract or a mutual recission of the contract, when rescission is warranted, or when the express contract does not fully address a subject matter.

141.    Bridge committed fraud under Maryland common law, because it: 1) made a representation, that Plaintiff's house was worth $755,000.00, that was false; 2) Bridge knew the representation was false or made the misrepresentation with such reckless indifference to truth as to impute knowledge and an intent to defraud, given that Bridge understated the size, number of bathrooms and business purposes of the

"comparables" cited in its appraisal report and vastly inflated the worth of Plaintiff's house; 3) Bridge's misrepresentation was made for the purpose of deceiving Plaintiff into believing that her house was worth far more than market value as inducement to enter into the subject mortgage loan; 4) Plaintiff reasonably relied upon Bridge's misrepresentation to enter into a $641,750.00 mortgage loan; and 5) Plaintiff suffered damage, such as the loss of equity in her home, the destruction of her creditworthiness, threats of foreclosure and increased medical bills related to the stress related these harms, directly resulting from Bridge's misrepresentation.

142.     Bridge was unjustly enriched by this fraud, because Plaintiff: 1) Plaintiff conferred a benefit upon Bridge, specifically, $350.00; 2) Bridge had an appreciation or knowledge of the benefit; and 3) the acceptance or retention by Bridge of the benefit under fraudulent circumstances makes it inequitable for Bridge to retain the benefit without the payment of its value.

143.     The Court has the power of reformation of the mortgage agreement in instances of fraud or other inequitable conduct.

144.     WHEREFORE, Plaintiff demands judgment against Defendant Bridge in the form of payment to Plaintiff of Bridge's $350.00 appraisal fee; reformation of a mortgage between Plaintiff and PNC with a loan amount for the fair market value of Plaintiff's house with monthly payments not to exceed 31% of Plaintiff's monthly income; payment of Plaintiff's medical costs related to stress suffered as a result of Bridge's fraud; and punitive damages in the amount of $250,000.00.  In addition, Plaintiff seeks costs and any other relief to which this Court finds Plaintiff is entitled.

**COUNT VII**
(Common Law Tortious Conspiracy to Defraud)

Challenge, Story and Bridge

145.     Plaintiff hereby incorporates by reference number Paragraphs 1-144 and further states:

146.     The tort of civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.

147.     The plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury.

148.     The tort actually lies in the act causing the harm; the agreement to commit that act is not actionable on its own but rather is in the nature of an aggravating factor.

149.     Civil conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff.

150.     Story, as agent for Challenge, and Bridge combined to commit fraud, an unlawful act, by inflating the appraisal value of Plaintiff's house, so that Story and Challenge could receive higher fees than if the house (and resulting mortgage loan) was appraised at a lower value.

151.     Story made a note to himself to have the house appraised at $750,000.00, and that Bridge, the appraiser, would do as he was told.

152.     Bridge, not coincidentally, appraised the value of Plaintiff's house at $755,000.00.

153.     Plaintiff suffered injuries from Story's and Bridge's overt acts of fraud emanating from the Story-Bridge conspiracy (Story's misrepresentations to Plaintiff and

Bridge's hyper-inflated house appraisal), notably the loss of equity in her home, the destruction of her creditworthiness, threats of foreclosure and increased medical bills related to the stress related these harms.

154.    The Court has the power of reformation of the mortgage agreement in instances of fraud or other inequitable conduct.

155.    WHEREFORE, Plaintiff demands judgment against Defendants Challenge, Story and Bridge in the form of payment to Plaintiff of Defendants' fees that have been paid by Plaintiff; reformation of a mortgage between Plaintiff and PNC with a loan amount for the fair market value of Plaintiff's house with monthly payments not to exceed 31% of Plaintiff's monthly income; payment of Plaintiff's medical costs related to stress suffered as a result of Defendants' fraud; punitive damages in the amount of $250,000.00.  In addition, Plaintiff seeks costs and any other relief to which this Court finds Plaintiff is entitled.

Respectfully submitted,

THE HAMRICK GROUP, LLC LAW FIRM

Steven J. Hamrick
22530 Sweetleaf Lane
Gaithersburg, MD  20882
202-415-7983

Attorney for Plaintiff