IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LINDA E. FARWELL

v.                              :    Civil Action No. DKC 10-1274

LEON STORY, et al.

:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this mortgage lending case are several motions: (1) a motion to dismiss (ECF No. 25) filed by Defendant Jon Lane (doing business as Bridge Street Appraisals); (2) a motion to dismiss (ECF No. 28) filed by Defendant Leon Story; (3) a motion to dismiss or, in the alternative, for summary judgment (ECF No. 29) filed by Defendant PNC Mortgage; (4) a motion for leave to amend the complaint (ECF No. 35) filed by Plaintiff Linda Farwell; and (5) a motion to strike (ECF No. 41) filed by Defendant PNC Mortgage. The issues have been fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the court will grant in part and deny in part PNC Mortgage's motion to dismiss. (ECF No. 29). The motions to dismiss filed by Defendants Jon Lane and Leon Story (ECF Nos. 25, 28) will be granted. Farwell's current motion for leave to amend (ECF No. 35) will be denied and PNC

Mortgage's motion to strike (ECF No. 41) will be denied as moot, but Farwell will be permitted to file a proper motion for leave to amend within 21 days.

## I. Background

### A. Factual Background[1]

### 1. Farwell's Initial Relationship with Story

Plaintiff Linda Farwell owns a home in Darnestown, Maryland. (ECF No. 2 ¶ 7). Sometime in 2004, Farwell contacted Defendant Leon Story, a mortgage broker, and began negotiating with him to refinance an existing mortgage on that home. (*Id.* ¶ 8). According to Farwell, she and Story soon became more than just a professional acquaintances – indeed, Story would call Plaintiff "frequently." (*Id.* ¶ 11). Among other things, Story would tell Farwell about potential investments that he claimed could earn profits for Farwell. (*Id.* ¶ 8). Story claimed he had already profited from such investments and could show Farwell how to do so as well. (*Id.*).

The complaint indicates that Story also made several big promises about Farwell's home. Story "promise[d]" that Farwell's house would eventually be worth $1,000,000 and convinced her that refinancing it would be in her "best interests." (*Id.* ¶¶ 8, 11, 14). Farwell alleges that, in

---

[1] The facts herein are taken from Farwell's complaint. (ECF No. 2).

reality, Story was preying on her "vulnerable status" as an unemployed "older person" and sufferer of multiple sclerosis. (*Id.* ¶¶ 1, 10, 15).[2]

Over a period of a few years, Farwell worked with Story in refinancing her home several times. Farwell first refinanced sometime in 2005. (*Id.*). Then, on January 11, 2007, Story again acted as a broker for Farwell when she refinanced her home a second time, this time with GMAC Mortgage. (*Id.* ¶¶ 7-8).[3]

**2. The Bridge Street Appraisal**

In anticipation of the January 2007 refinance, Story hired Defendant Bridge Street Appraisals ("Bridge Street") to conduct an appraisal of Farwell's house. (*Id.* ¶ 16). Bridge Street, allegedly acting under instructions from Story, appraised Farwell's home on December 11, 2006 at $755,000. (*Id.*).

Farwell notes several deficiencies in the Bridge Street appraisal. For one, the appraiser did not view the interior of Farwell's home, where he would have discovered "non-functioning garage doors, plumbing problems, a failing boiler and neutralizing tank, ceiling leaks, outdated appliances and

_____

[2]      In support, Farwell cites notes from Story that read, "Duty of care – ability to repay – no income bedridden – MS" and "Appraiser did what told to do.  $750K."  (ECF No. 2 ¶ 15).

[3]      The January 2007 mortgage carried a principal amount of $566,250, which amounted to a monthly payment of just over $3,244.  (ECF No. 2 ¶ 7).

damaged floors." (*Id.* ¶ 17). Bridge Street did not observe that the roof was roughly 30 years old and needed to be replaced. (*Id.* ¶ 18). It also falsely reported that the house had new windows, a new porch, and new ceiling fans, when in truth the windows and porch were original and no fans were installed. (*Id.* ¶ 19). In addition, there were several issues with the comparable homes used: one home had an additional bathroom not listed on the appraisal, while another had an additional unlisted half-bathroom and contained 428 more square feet than listed. (*Id.* ¶¶ 20-22). A third comparable "home" was actually a commercial building in a different town that was built ten years after Farwell's house. (*Id.* ¶ 23).

### 3. The April 2007 Refinance

On April 11, 2007, just a few months after her refinance with GMAC Mortgage, Farwell again refinanced her house, this time with National City Mortgage ("National City"). (*Id.* ¶ 25). Story allegedly promised Farwell that the new mortgage with National City was to be "an interest-only loan for the life of the loan." (*Id.* ¶ 12). He told her that the new mortgage would cancel her "Private Mortgage Insurance." (*Id.* ¶ 13). And Story assured Farwell that "he would be able to lower her monthly mortgage payments in the immediate future after [she] refinanced her GMAC mortgage loan through National [City]." (*Id.* ¶ 12).

In Farwell's view, the closing documents for this transaction were "contradictory and confusing." (*Id.* ¶ 26). For example, many of the documents provided different monthly payments. While the Amortization Schedule and the Interest Only Payment Period Note Addendum listed the initial payment as $3,676.69,[4] the Note listed a monthly payment of $4,215.85. (*Id.* ¶¶ 27, 29, 31). A Payment Breakdown listed the initial monthly payments at $4,453.86, but the Truth in Lending Disclosure Statement[5] provided for a payment schedule of (1) $4,018.96 for the first 120 months, (2) $5,034.41 for the next 38 months, (3) $4,927.45 for the next 201 months, and (4) $4,924.07 for the final month of the loan. (*Id.* ¶¶ 32, 37). The Uniform Residential Loan Application listed a monthly payment of $4,100.01. (*Id.* ¶ 39). The closing documents also provided different loan amounts. For instance, the Deed of Trust lists debt to National City of $641,750 and the Note provides the same figure as the principal amount. (*Id.* ¶¶ 29, 31). The Settlement Statement, Request for Title Commitment, Special Loan

---

[4] The Interest Only Payment Period Note Addendum stated that the payment would be $3,676.69 for the first 120 months and $4,927.45 for each month thereafter. (ECF No. 2 ¶ 30).

[5] Farwell says she received the Truth in Lending disclosures mandated by 12 C.F.R. § 226.18 "by telefax on the day of the loan's consummation, April 11, 2007." (ECF No. 2 ¶ 93).

Instructions, and Uniform Residential Loan Application also listed $641,750 as the loan amount. (*Id.* ¶¶ 32-34, 39). The Truth in Lending Disclosure Statement, however, listed the amount financed as $631,922.30. (*Id.* ¶ 36).

In addition, the closing documents for the April 11 refinance allegedly reflect that National City was aware that Farwell was unemployed. The Borrower Personal Information sheet, for example, did not list a work number for Farwell. (*Id.* ¶ 28). Similarly, the Uniform Residential Loan Application did not list any employment. (*Id.* ¶ 41). Farwell states that she was not required to provide "traditional supporting documentation to demonstrate income, employment, and assets." (*Id.* ¶ 107).

### 4.   Farwell's Default and Subsequent Events

The April 2007 refinance did not go well for Farwell – the loan "was delinquent almost from the beginning." (*Id.* ¶ 112). As a result, Farwell and National City[6] had a number of communications concerning her mortgage, much of which Farwell attached to her complaint. In two letters dated February 24, 2009, for instance, National City "referenced a conversation

---

[6]   The complaint states that PNC Financial Services acquired National City Corporation on December 31, 2008. (ECF No. 2 ¶ 43). Later – apparently around late 2009 – "PNC began rebranding National City Mortgage as 'PNC Mortgage'." (*Id.* ¶ 56).

[Farwell] had with a National Loan Counselor regarding mortgage relief options" and requested certain income and expense information to determine Farwell's eligibility for mortgage relief. (*Id.* ¶¶ 44-45). Another letter dated March 21, 2009 indicated that National City "was considering [Farwell] for a loan modification," and asked for additional information. (*Id.* ¶ 46). National City sent yet another request for the same type of information on May 4, 2009. (*Id.* ¶ 48).[7]

On May 15, 2009, National City denied Farwell's "hardship assistance request" because she had a "deficit income." (*Id.* ¶ 49). Two weeks later, in a letter dated May 28, National City informed Farwell that it had referred her loan to its foreclosure department. (*Id.* ¶ 50). A letter dated the next day stated that "National [City] had referred [Farwell]'s loan to National [City]'s attorney 'who has been instructed to proceed with foreclosure.'" (*Id.* ¶ 51).

On June 19, 2009, Farwell met with Paul Leibold of National City to discuss the possibility of a loan modification. (*Id.* ¶ 52). Leibold then asked for a "hold" to be placed on National City's foreclosure process; that hold was put in place on June 22, 2009. (*Id.* ¶¶ 53-54). At some time thereafter, Farwell

---

[7]    Farwell also signed a document on May 1, 2009 allowing Story to check the status of her loan modification request. (*Id.* ¶ 47).

apparently filed an application for modification under the Home Affordable Modification Program ("HAMP").[8] To give National City time to consider this application, Farwell signed a Non-Curing Forbearance Agreement on August 21, 2009, under which National City "agreed to forebear its conduct of a foreclosure sale until after November 30, 2009 in exchange for three monthly payments from [Farwell] of $1,247.75." (*Id.* ¶ 55). As the end of the three-month forbearance period neared completion, however, National City informed Farwell that its "loan modification group had been too busy to review [her] documentation." (*Id.* ¶ 57). As a result, Farwell and National City signed a second Non-Curing Forbearance Agreement on November 24, 2009, under which National City agreed to forbear for another three months (to February 28, 2010) for the same payment as before. (*Id.* ¶ 57).

After hearing nothing from National City (which had since changed its name to PNC Mortgage ("PNC")), Farwell contacted PNC Mortgage employee Michael Schick. (*Id.* ¶ 58). Schick offered Farwell a "trial" HAMP modification. (*Id.*). But when Farwell received the HAMP documentation, she realized that "the payments

---

[8]    According to Farwell, she received different information about whether her loan was even eligible for HAMP. Various employees of PNC told Farwell that (1) "her loan was securitized, and that the owners of the securitized loan refused to participate in HAMP;" (2) "the her loan was securitized, and the owners of her securitized loan are participating in HAMP;" and (3) "her loan is not securitized." (ECF No. 2 ¶ 64).

were larger than then HAMP-mandated 31% of Farwell's monthly income." (*Id.* ¶ 59). Farwell contacted PNC's HAMP advocacy line, who informed her that the payments had been based on an income of over $8,000 a month. (*Id.* ¶¶ 60-61).

Farwell believed the payment calculation was an "electronic or clerical error." (*Id.* ¶ 62). In an effort to correct the problem, she contacted her attorney, Jerry Solomon. (*Id.*). Solomon contacted Schick and submitted documents to PNC on Farwell's behalf, in an effort to confirm Farwell's income and "conform" the payment to "HAMP's payment formula." (*Id.*).

Despite Solomon's efforts, Farwell was unable to correct the issue with her HAMP payment calculation. Cara McConnell, another PNC employee, told Farwell on March 18, 2010 that she did not know how to correct the error. (*Id.* ¶ 65). Nevertheless, McConnell suggested that Farwell's "only way to proceed" was to withdraw her initial HAMP application and reapply. (*Id.* ¶ 65). On March 22, 2010, Farwell received a letter from PNC Collections indicating that she had withdrawn from the HAMP program. (*Id.* ¶ 66). When Farwell contacted PNC the same day, a PNC employee informed her that her file had been

sent to PNC Collections. (*Id.* ¶ 67). Farwell was told she could no longer speak with McConnell. (*Id.*).[9]

## B. Procedural Background

Farwell originally filed a complaint in the Circuit Court for Montgomery County on April 9, 2010, which PNC removed to this court on May 20, 2010. (ECF No. 1, at 1).[10] In that complaint, Farwell alleges that PNC, as successor-in-interest to National City, violated the Truth in Lending Act ("TILA"), the Maryland Consumer Protection Act ("MCPA"), and the Fair Debt Collection Practices Act ("FDCPA"). (ECF No. 2, at 12-21). Farwell also asserts a breach of contract claim against PNC. (*Id.* at 21-22). Moreover, Farwell asserts three fraud-based claims against Story, Bridge Street, and Challenge Financial Investors Corporation ("Challenge").[11] (*Id.* at 21-28).

Story, Bridge Street, and PNC all filed motions to dismiss in June 2010. (ECF Nos. 25, 28, 29). Challenge, however, was never served and Farwell failed to respond to the court's show cause order as to why service was not effected. (ECF No. 47).

---

[9] Around the same time, on March 3, 2010, PNC Bank closed Farwell's Points VISA account because of "[s]erious delinquency and public record or collection filed at the bureau." (ECF No. 2 ¶ 63).

[10] At the time of removal, Farwell had not yet served PNC. (ECF No. 1, at 2).

[11] Challenge was allegedly Story's employer during most of the relevant events.

Consequently, the court dismissed Challenge from the case on November 17, 2010. (ECF No. 48).

Farwell opposed Defendants' motions to dismiss, albeit somewhat equivocally. (ECF Nos. 35 & 36). Farwell proposes to drop four of the seven counts from the current complaint – including the FDCPA claim, the breach of contract claim, and two of the three fraud claims – and substitute four new claims "based upon the same facts." (ECF No. 36, at 13). Farwell opposes dismissal of the TILA and MCPA claims, but does not address the third fraud claim for "common law tortious conspiracy to defraud." (ECF No. 36, at 9-13). Both Bridge Street and PNC replied in opposition to the proposed amendment. (ECF Nos. 40, 43). PNC reiterated its opposition to Farwell's request for leave to amend by filing a motion to strike Farwell's motion for leave to amend. (ECF No. 41).

## II. Motion to Dismiss

### A. Standard of Review

Defendants have all moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*,

534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal citations omitted).

The court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court need not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Iqbal*, 129 S.Ct. at 1950, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). *See also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### B. Analysis

At the outset, many of Farwell's claims may be easily dispensed with given her concession that the claims are "over-stated." (ECF No. 36, at 12). Farwell wishes to "withdraw" her claims against PNC for breach of contract and violation of the FDCPA (counts three and four), her claim against Story for common law fraud and unjust enrichment (count five), and her claim against Bridge Street for the same (count six). (ECF Nos. 35, at 2; 26, at 13). The court will accede to Farwell's request and dismiss those four counts. Given that Farwell's complaint now lacks any tort claim, she cannot proceed on her claim for civil conspiracy (count seven) either. *See Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 128-29 (2006) ("[C]ivil conspiracy is not capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff."). Consequently, two counts remain. The court will address each in turn.

**1. Truth in Lending Act Claims**

First, the complaint alleges that PNC's predecessor, National City, violated TILA in several ways. TILA was enacted by Congress to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 54 (2004) (quoting 15 U.S.C. 1601(a)). TILA attempts to accomplish this purpose by requiring lenders to disclose information about things such as "finance charges, annual percentage rates of interest, and borrowers' rights." *Id.* Because the statute is meant to favor consumers, "the provisions of TILA must be 'absolutely complied with and strictly enforced.'" *Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 819 n.4 (4th Cir. 2007) (quoting *Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir. 1983)). If they are not, the lender may be subject to "such penalties as money damages, attorney's fees and rescission." *In re Sterten*, 546 F.3d 278, 280 (3[d] Cir. 2008).

One of the material disclosures a lender must make is the "amount financed," which is "defined to be the 'amount of credit of which the consumer has actual use.'" *Gibson v. LTD, Inc.*, 434 F.3d 275, 280 (4th Cir. 2006) (quoting 15 U.S.C. § 1638(a)(2)(A)). Many of the TILA violations Farwell alleges in

this case rest on the same fundamental complaint that National City provided different and allegedly contradictory loan and payment amounts in the mortgage closing documents. (*See, e.g.*, ECF No. 2 ¶¶ 71, 87 (National City purportedly failed to provide "a meaningful disclosure of credit terms . . . [because it] supplied credit terms that showed two different loan amounts and five different payment amounts"); *id.* ¶ 75 (National City misleadingly disclosed "the loan amount and monthly payment amounts"); *id.* ¶ 84 (National City provided "two different finance amounts"); *id.* ¶ 89 (National City failed to provide "clear and conspicuous" disclosures because they were "contradictory")). PNC contends Farwell's allegations all rest upon a misunderstanding of the "amount financed" disclosure. According to PNC, TILA requires only that lenders accurately calculate the "amount financed" based on a above-mentioned statutory definition; it does not require that the "amount financed" (or the payment schedule) in the TILA disclosure be in perfect congruence with the loan amounts found in all the other closing documents. (ECF No. 29-1, at 5-6).

In her complaint, Farwell does not raise any suggestion that the disclosures were insufficient or otherwise factually inaccurate. Rather, she relies solely upon the notion that they became misleading when read next to other loan documents containing "contradictory terms." The United States Court of

Appeals for the Fourth Circuit has already considered and rejected a similar argument. In *Smith v. Anderson*, 801 F.2d 661, 663 (4th Cir. 1986), a borrower alleged that "the creditor created unnecessary confusion by stating different interest rates and principal amounts on the note and in the truth-in-lending statement." In affirming the district court's entry of summary judgment for the lender, the Fourth Circuit agreed with the position taken by PNC in the present case:

> The perceived inconsistency arises, however, from the lender's compliance with the truth-in-lending requirements. "APR" and "amount financed" are terms of art, defined by federal regulations, and explained in the disclosure statement itself. "Amount financed" is derived by making certain adjustments to the principal loan amount, most notably the subtraction of any prepaid finance charge. There is therefore no inconsistency in the fact that this "amount financed" differs from the principal amount of the loan, and the difference is clearly explained in the disclosure. . . . Rather than being a deliberate attempt to deceive, therefore, [the lender]'s disclosures in the truth-in-lending statement served to supplement the information provided in the note in the uniform manner required by federal law, and to convey to the borrowers in understandable terms the true extent of their obligations.

*Id.* at 663-64 (citations and footnotes omitted). Here, just as in *Smith*, there is no suggestion that the inconsistencies resulted from anything other than definitional differences. As such, all claims relating to National City's (and thus PNC's)

disclosure of contradictory principal and payment terms must be dismissed.

As Farwell notes (ECF No. 2 ¶ 92), TILA and its implementing regulations (Regulation Z) require certain mortgage lenders to provide good faith estimates of certain disclosures (a) no later than three business days after the lender receives a written mortgage application and (b) at least seven business days before "consummation of the transaction." *See* 12 C.F.R. § 226.19(a). Farwell maintains that she did not receive the required disclosures until April 11, 2007, the day the loan was closed. (*Id.* ¶ 93). PNC has now provided the court with three disclosure statements, which it says it provided on March 17, March 23, and March 26 of 2007. (ECF No. 29-1, at 6). Such disclosures would be timely.

At the motion to dismiss stage, Farwell's factual allegation that she did not receive the required disclosures until the day of closing is enough.[12] Although PNC's extrinsic documents might strongly support its position, it is generally the case that "extrinsic evidence should not be considered at

---

[12]    Such is the case even though one of the disclosures was signed. "Although the signed acknowledgement may be useful evidence concerning whether the required disclosures were made, it creates no more than a rebuttable presumption that the proper notice was given." *DeCosta v. U.S. Bancorp*, No. DKC 10-0301, 2010 WL 3824224, at *4 (D.Md. Sept. 27, 2010) (citing 15 U.S.C. § 1635(c)).

the 12(b)(6) stage." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). A court may consider an extrinsic document if "it was integral to and explicitly relied on in the complaint and [if the plaintiffs do not challenge its authenticity," but Farwell did not rely upon the documents provided. *Id.* (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). Moreover, the court declines PNC's footnote request to treat its motion as one for summary judgment, as the case is still at a very early point and no discovery has taken place. Consequently, the court will not dismiss Farwell's claims concerning PNC's alleged failure to provide timely TILA disclosures.

In addition, Farwell introduced a new and somewhat vague allegation in her opposition that PNC improperly failed to "make allowance" in the disclosed amount financed of a "Broker Fee" paid to National City. (ECF No. 36, at 10). "These factual allegations are not properly considered, as a memorandum of law opposing a motion to dismiss is not the proper means to supplement the complaint." *Nat'l Labor Coll. v. Hillier Grp. Architecture New Jersey, Inc.*, No. DKC 09-1954, 2010 WL 3609534, at *7 (D.Md. Sept. 14, 2010). Even if the court could consider them, the allegations would simply be too indistinct and conjectural to allow them to proceed. (*See, e.g.*, ECF No. 36, at 10 ("One is left wondering what [the charge for a Broker Fee]

18

actually represents."")).  "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### 2.  Maryland Consumer Protection Act Claims

Farwell also argues that PNC violated the MCPA (through its predecessor, National City) when it refinanced her mortgage on April 11 without adequately verifying her income or employment. (ECF No. 2 ¶¶ 105-12).  As a result, PNC purportedly approved a loan to Farwell "that she could never afford, should have never received, and was exceedingly risky."  (*Id.* ¶ 114).  PNC suggests that Farwell's claim fails because (1) Maryland law did not impose any duty on PNC to advise her as to the appropriateness of the refinance; (2) PNC did not intend to induce (or actually induce) Farwell to enter the loan; and (3) Farwell has not alleged that she reasonably relied on any inducement from PNC.

"The [MCPA], codified at Maryland Code . . . §§ 13-101 *et seq.* of the Commercial Law Article was intended to provide minimum standards for the protection of consumers in [Maryland]." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 140 (2007).  The Maryland Legislature passed the Act "in response to mounting concern over the increase of deceptive trade practices" and because it felt that "existing federal and State laws [were] inadequate, poorly coordinated and not widely known or

adequately enforced." *Morris v. Osmose Wood Preserving*, 340 Md. 519, 536-37 (Md. 1995). Much like TILA, the MCPA is intended to be liberally construed in order to achieve its consumer protection objectives. *See State v. Cottman Transmissions Sys., Inc.*, 86 Md.App. 714, 743 (1991).

Citing the text of the MCPA, Farwell argues that she need not prove reliance to establish a violation of the Act. (ECF No.36, at 11-12 (citing Md. Code Ann., Com. Law § 13-302 ("Any practice prohibited by [the MCPA] is a violation of [the MCPA], whether or not the consumer in fact has been misled, deceived, or damaged as a result of that practice."))). The mere existence of a violation, however, does not necessarily lead to private relief, and Farwell ignores the "clear distinction between the elements necessary to maintain a public enforcement proceeding versus a private enforcement proceeding." *CitaraManis v. Hallowell*, 328 Md. 142, 152 (1992). A party who files a complaint with the Attorney General need not establish reliance leading to actual injury.[13] *Lloyd*, 397 Md. at 142. On the other hand, a private party who brings her own suit must establish that she has "suffered an identifiable loss, measured

---

[13] Even when a consumer decides to pursue public enforcement, "the Division must determine that the consumer relied upon the misrepresentation" before it can order a violator to pay restitution to that particular consumer. *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 164 (2005).

by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation." *Id.* at 143. Thus, Farwell must establish injury and reliance "despite the language in [Section] 13-302." *Morris*, 340 Md. at 634 n.10.

Farwell's claims under the MCPA rest on PNC's failure to verify her income and employment. Even if such a failure is actionable under the MCPA, Farwell has not alleged that she relied on PNC's failure to verify to her detriment. Absent an allegation of reliance, it cannot simply be assumed here, where there is at least some possibility that Farwell was a "complicit or willing purchaser" who wished to keep her home at all costs. *Cf. Consumer Prot. Div. v. Morgan*, 387 Md. 125, 167 (2005) (explaining, in case where mortgage lenders were accused of various abuses, that an "individual consumer's desire to purchase a home might have outweighed the consideration of price"). As such, Farwell's MCPA claims – found in count II of the complaint – must be dismissed.[14]

## III. Motion for Leave to Amend

### A.   Standard of Review

Farwell requested leave to amend on August 5, 2010, well after Defendants' filed their Rule 12(b)(6) motions. Federal

---

[14]   Because the lack of any alleged reliance justifies dismissal of Farwell's MCPA claim, the court need not discuss PNC's remaining arguments.

Rule of Civil Procedure 15(a) provides that, after 21 days have passed from the filing of a responsive pleading or Rule 12(b) motion, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Leave should be granted "[i]n the absence of . . . undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Local Rules of this court also impose certain requirements on plaintiffs who seek leave to amend.  Those requirements, found in Local Rule 103.6, are worth quoting in full:

> **a.** **Original of Proposed Amendment to Accompany Motion**
> Whenever a party files a motion requesting leave to file an amended pleading, the original of the proposed amended pleading shall accompany the motion.  If the motion is granted, an additional copy of the amended pleading need not be filed.  The amended pleading shall be deemed to have been served, for the purpose of determining the time for response under Fed. R. Civ. P. 15(a), on the date that the Court grants leave for its filing.

**b.    Exhibits to Amended Pleadings**
Unless otherwise ordered by the Court, only newly added exhibits are to be attached to an amended pleading. However, if the amended pleading adds a new party, counsel shall serve all exhibits referred to in the amended pleading upon the new party.

**c.    Identification of Amendments**
Unless otherwise ordered by the Court, the party filing an amended pleading shall file and serve (1) a clean copy of the amended pleading and (2) a copy of the amended pleading in which stricken material has been lined through or enclosed in brackets and new material has been underlined or set forth in bold-faced type.

**d.    Requested Consent of Other Counsel**
Before filing a motion requesting leave to file an amended pleading, counsel shall attempt to obtain the consent of other counsel. Counsel shall state in the motion whether the consent of other counsel has been obtained.

## B.    Analysis

Farwell's present motion for leave to amend must be denied. The motion does not comply with any of the Local Rule requirements applicable to such motions. Farwell has not provided a copy of the proposed amended complaint, has not filed a "red-lined" version of the complaint, and counsel has not indicated whether he sought the consent of opposing counsel. These deficiencies were not rectified even after counsel for Bridge Street wrote Farwell's counsel and outlined the requirements of the Local Rules. (ECF No. 43-1, at 1).

Compliance with the Local Rules is not optional. The rules pertaining to amendments, for instance, help ensure that the court has available all the information it needs to determine whether leave can be appropriately granted. And, of course, "[t]hose rules have the force of law." *Hollingsworth v. Perry*, 130 S.Ct. 705, 710 (2010) (quotation marks and citations omitted); Fed.R.Civ.P. 83(a)(1). As such, counsel should be wary of ignoring them.

Because Farwell's motion for leave to amend does not comply with the Local Rules, it cannot be granted. The motion will be denied without prejudice to Farwell's right to file a motion for leave to amend within 21 days that complies with Local Rule 103.6. Although Bridge Street and PNC suggest that even this step is unnecessary because any amendment would be futile, the court cannot conclude on the papers before it that "the proposed amendment is clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). This is primarily so because it is not yet entirely clear what the proposed amendment will include.[15]

## IV. Conclusion

For the foregoing reasons, the court will grant in part and deny in part PNC Mortgage's motion to dismiss. (ECF No. 29).

---

[15]    PNC's motion to strike (ECF No. 41) will be denied as moot.

The motions to dismiss filed by Defendants Jon Lane and Leon Story (ECF Nos. 25, 28) will be granted.  Farwell's current motion for leave to amend (ECF No. 35) will be denied and PNC Mortgage's motion to strike (ECF No. 41) will be denied as moot, but Farwell will be permitted to file a proper motion for leave to amend within 21 days.  A separate order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
